IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>MALIK NASIR,<br><br>    Defendant. | Crim. No. 16-15-LPS |

David C. Weiss, Acting United States Attorney, and Daniel E. Logan, Jr., Assistant United States Attorney, U.S. DEPARTMENT OF JUSTICE, Wilmington, DE

    Attorneys for Plaintiff

James F. Brose, BROSE LAW FIRM, Media, PA

    Attorney for Defendant

**MEMORANDUM OPINION**

March 15, 2017
Wilmington, Delaware

STARK, U.S. District Judge:

On February 23, 2016, a federal grand jury indicted defendant Malik Nasir ("Defendant" or "Nasir") on three counts, relating to drug distribution and unlawful possession of a firearm. (D.I. 1) On July 21, 2016, Nasir filed a motion to suppress evidence. (D.I. 28) The Court held an evidentiary hearing on September 7, 2016. (*See* D.I. 38 ("Tr.")) Nasir then filed a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). (D.I. 35) The Court denied Nasir's *Franks* motion (D.I. 46) and allowed the government to supplement the evidentiary record at a second hearing, held on December 21, 2016 (*see* D.I. 52 ("Dec. Tr.")). The parties then briefed Nasir's suppression motion (*see* D.I. 51, D.I. 53, D.I. 54), which the Court now resolves.

I. BACKGROUND

On March 10, 2015, defendant Malik Nasir leased a 5x5 foot unit at Liberto Mini Storage in Dover, Delaware. (*See* D.I. 35 at 7 of 7 ("Rental Agreement")) The Rental Agreement gave Nasir use of "Space No. C43," subject to certain terms and conditions. (*Id.*)

Around nine months later, on December 21, 2015, the Liberto facility's owner made a phone call to Delaware State Police (DSP) Troop Number 3. During over-the-phone and in-person conversations with DSP Sergeant Lance Skinner, the facility owner complained of possibly suspicious and potentially illegal activity being carried out of unit C69, prompting DSP to investigate. (*See, e.g.*, Tr. at 5, 7) The tenant leasing unit C69 was apparently accessing his space up to five times daily, in different vehicles, and would enter his small 5x5 unit, close the door behind him for a short time, reemerge, and leave the facility. (*Id.* at 8, 66) The facility owner had taken a photo showing that inside the unit were two large coolers, two closed buckets, a box of baggies, something that looked like a duffel bag, and a can of something. (*Id.* at 10)

1

The facility owner told Skinner that unit C69 belonged to Malik Nasir, and provided Skinner with the Rental Agreement and a photocopy of Nasir's driver's license. (*Id.* at 11) DSP officers did not notice the discrepancy between the unit number on the Rental Agreement, C43, and the storage owner's statements about unit C69, and so did not press for an explanation. (*See* Dec. Tr. at 8-9)

DSP then ran a criminal history check and learned that Nasir had felony drug convictions on his record. (Tr. at 13) Later that evening, DSP officers returned to the facility with Detective Donaldson and a trained and certified narcotics detection dog named Ripper. (*Id.* at 15; *see also* D.I. 30-1 ("Warrant Affidavit") at 5-6) Ripper "positively alerted to the odor of narcotics emanating from" unit C69. (Warrant Aff. at 6; *see also* Tr. at 16)

Next, DSP detectives applied for a search warrant for unit C69 from the Justice of the Peace Court. (*See generally* Warrant Aff.) In the meantime, while other DSP officers remained at the storage facility "holding" the unit, a DSP detective monitoring Nasir's home saw Nasir place a large black bag in the cargo area of a Mercury Mariner SUV. (Tr. at 26) Nasir then got into the Mariner SUV, which was registered in Nasir's name, and drove it directly to the storage facility. (*Id.*) As Nasir drove into the lane in which unit C69 was located, DSP officers stopped his vehicle, handcuffed him, and put him in the back of a patrol car. (*See id.* at 29-30) Skinner testified this was done "as soon as [the driver] committed to the area of where it would lead [the driver] to C69" (*id.* at 28), and that it was done for the purpose of preventing Nasir from "compromis[ing]" execution of the search warrant (*id.* at 30), the application for which was then pending before a judge. A search of the Mariner recovered a key to unit C69 and a "duffle bag" with "marijuana residue." (*Id.* at 32)

When the search warrant was issued and executed that same night, officers found that unit C69 contained in excess of 3 kilograms of marijuana, as well as scales and packaging materials. After a separate search warrant was issued, officers searched a Dodge Charger registered in Nasir's name and parked outside his home; they found that this vehicle contained $5,000 in a grocery bag and several handguns with ammunition. (*Id.* at 37, 39)

With his motion to suppress, Nasir urges the Court to "exclude all evidence gathered in this case." (D.I. 51 at 9)

## II. LEGAL STANDARDS

The United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This Fourth Amendment right "shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.* Accordingly, probable cause is the "threshold requirement for issuance of a warrant." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005). A search and seizure made pursuant to a warrant based on probable cause is generally reasonable. *See Katz v. United States*, 389 U.S. 347, 356-57 (1967).

In contrast, "[s]earches conducted absent a warrant are *per se* unreasonable under the Fourth Amendment, subject to certain exceptions." *Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149, 168-69 (3d Cir. 2016) (internal quotation marks omitted). "The few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and the burden is on those seeking the exemption to show the need for it." *Id.*

The exclusionary rule provides that evidence collected in violation of a defendant's

3

constitutional rights may be inadmissible in a criminal prosecution. *See Weeks v. United States*, 232 U.S. 383, 388 (1914). Thus, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *United States v. Leon*, 468 U.S. 897, 916 (1984). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, . . . the deterrence rationale loses much of its force." *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal citations and quotation marks omitted).

### III. DISCUSSION

Nasir identifies five grounds for suppressing the government's evidence against him. (*See* D.I. 51 at 5-6) The Court addresses each in turn.

#### A. Canine "Sniff Test"

Nasir contends that DSP's use of a drug-sniffing dog outside the storage unit violated his reasonable "expectation of privacy in the locker unit as evidenced by the contents being locked behind closed doors." (D.I. 51 at 7) Nasir argues that the search was improper regardless of whether the probable cause or reasonable suspicion standard applies. (*Id.* at 8-9) The government responds that the dog sniff was not a Fourth Amendment "search" because it involved neither "trespass onto a constitutionally-protected area" nor "infringe[ment] of [Nasir's] reasonable expectation of privacy." (D.I. 53 at 6-7)

Nasir relies on *Florida v. Jardines*, 133 S. Ct. 1409 (2013), in which the Supreme Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." *Id.* at 1417-18. The Court's conclusions were based on the facts there, including that "[t]he officers were gathering information in an area belonging to Jardines and immediately surrounding his

4

house . . . by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner." *Id.* at 1414. Nasir, quoting the Fourth Amendment's safeguard of "persons, houses, papers, and effects," argues that "the content of [his] personal storage locker kept under lock and key" is similarly protected. (D.I. 51 at 7)

Nasir's *Jardines* argument is unavailing. The "curtilage of [a] house . . . enjoys protection as part of the home itself." *Id.* By contrast, Nasir had no expectation of privacy in the area immediately outside of his storage unit. The Liberto facility is located along a state highway and does not have a gate or other barrier at its entrance. (*See* Tr. at 5-6) It is in a commercial area, near a pizza restaurant and other commercial establishments, and is not surrounded by a fence or gate. (*Id.* at 5-6) The Court agrees with the government that Nasir "did not have a reasonable expectation of privacy in the common area of the outside, commercial storage unit." (D.I. 53 at 8; *see also United States v. Parrilla*, 2014 WL 2111680, at *4 (S.D.N.Y. May 13, 2014) (finding canine sniff of defendant's commercial garage did not implicate reasonable expectations of privacy))

In addition, the storage facility's owner invited DSP onto the property. (*See* Tr. at 5, 59) Far from intruding without invitation onto the curtilage of Nasir's home, Ripper detected the scent of marijuana from a place where DSP had "a legal right to be." *United States v. Taylor*, 979 F. Supp. 2d 865, 881 (S.D. Ind. 2013), *aff'd*, 776 F.3d 513 (7th Cir. 2015).

Nor can Nasir rely on his expectation of privacy with respect to the locker's contents. The Supreme Court has held that "any interest in possessing contraband cannot be deemed 'legitimate,' and thus, governmental conduct that *only* reveals the possession of contraband compromises no legitimate privacy interest." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)

5

(internal quotation marks omitted). "Accordingly, the use of a well-trained narcotics-detection dog . . . generally does not implicate legitimate privacy interests." *Id.* at 409; *see also United States v. Lopez*, 2011 WL 2636890, at *6 n.7 (D. Del. July 6, 2011). Nasir has not demonstrated he had a reasonable expectation of keeping the contents of his rented storage unit private from a canine search. *See generally United States v. Place*, 462 U.S. 696, 707 (1983) ("[T]he canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure."). This conclusion is bolstered by the fact that in the Rental Agreement, Nasir gave the storage facility's owner the right to "enter to inspect" his rented unit at "any reasonable time." (Tr. at 63; *see also* Rental Agreement at ¶ 8)

In sum, the Court agrees with the government that the dog sniff was not a "search" under the Fourth Amendment, and so Nasir's argument for exclusion of "[a]ll the evidence gathered in this case," which he says "flows from the initial unlawful search by the canine" (D.I. 51 at 9), lacks merit.

### B.  Storage Unit Number Disparity

Nasir's brief essentially renews his *Franks* motion, which was based on the inconsistency between the locker number identified in the Rental Agreement, C43, and that specified in the Warrant Affidavit and ultimately searched, C69. Nasir argues that "[t]his discrepancy would have required additional investigation, explanation, and proof in the affidavit to show a connection between Mr. Nasir and C-69." (D.I. 51 at 11) Nasir contends that DSP's failure to notice and account for the discrepancy "was reckless and resulted in misinformation" in the Warrant Affidavit. (*Id.*)

6

In response to Nasir's *Franks* motion, the government produced a "Transfer Receipt," dated March 27, 2015, which shows that Nasir relocated from unit C43 to unit C69 about two weeks after he signed the Rental Agreement. (*See* D.I. 39 at 4 of 4) Skinner's testimony at the supplemental evidentiary hearing detailed how that Transfer Receipt came into the government's possession. (*See generally* Dec. Tr. at 8-11) The Court previously denied Nasir's motion for a *Franks* hearing, based on its finding that Nasir had not "made the required 'substantial preliminary showing' of any falsehood – intentional or otherwise – in the affidavit supporting the warrant application." (D.I. 46 at 4) The supplemented evidentiary record similarly fails to contain proof by a preponderance of the evidence of any such falsehood, which is what Nasir would have had to show at a *Franks* hearing. *See Franks*, 438 U.S. at 156.

The record does not support Nasir's contention that the discrepancy in unit numbers led to "misinformation" in the affidavit. As the Court observed in denying Nasir's *Franks* motion, the Warrant Affidavit does not appear to have relied on the Rental Agreement in specifying the unit to be searched. Instead, the affidavit states that "the [facility] owner advised that he had a tenant who was renting storage unit C69" and only thereafter does the affidavit go on to mention the Rental Agreement (in the next sentence). (Warrant Aff. at 4) The affidavit later mentions the Rental Agreement's content for the purpose of providing the basis for the facility owner's right to inspect (and photograph the contents of) leased units. (*See* Warrant Aff. at 5; *see also* Tr. at 62-63 ("He was basically showing us [the Rental Agreement] to show us that in the contract, when people agree to rent from his facility, he has a right to go in and search them.")) In other words, the Warrant Affidavit is better characterized as establishing that "Nasir rents unit C69," ***not*** "according to the Rental Agreement, Nasir rents unit C69." Only the latter statement would have

7

been untrue. The former statement was supported by evidence on which DSP officers relied in good faith.

Even if the Court found the Warrant Affidavit to contain a misrepresentation, relief would be warranted under *Franks* only upon a showing of either "knowing[] and intentional[]" falsehood or "reckless disregard for the truth." *Franks*, 438 U.S. at 155. Nasir charges DSP detectives with the latter. (D.I. 51 at 11) But the "reckless disregard" standard is only satisfied if "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Brown*, 631 F.3d 638, 645 (3d Cir. 2011) (internal quotation marks omitted). "[I]n general, the failure to investigate fully is not evidence of an affiant's reckless disregard for the truth." *Id.* at 648 (internal quotation marks omitted). As Nasir himself argues, the evidentiary record suggests that DSP failed to notice and follow up on the discrepancy between the storage unit owner's claim and the unit specified in the Rental Agreement. (*See* D.I. 51 at 10) This oversight was not "reckless" under the circumstances. The focus, understandably, was on the location of the potential illegal drugs – based on complaints from other storage unit renters and the facility's owner – and not as much on when and how Nasir came to occupy that particular unit.[1]

In sum, the Court agrees with the government that the unit number discrepancy is not a

---

[1] Thus, the Court disagrees with Nasir's argument that "[e]ven if the storage facility owner told the police that the lease was inaccurate and that Mr. Nasir did in fact rent C-69, the police would have been left with a lease agreement saying one thing and the owner saying another, which would hardly support probable cause." (D.I. 51 at 11) Probable cause does not require a certainty, nor even that all evidence in law enforcement's possession uniformly point to guilt. *See generally Illinois v. Gates*, 462 U.S. 213, 238 (stating that probable cause requires "a fair probability that contraband or evidence of a crime will be found in a particular place").

8

grounds for suppression of evidence in this case.[2]

### C. Warrantless Arrest & Vehicle Search

Nasir contends that DSP officers lacked probable cause to arrest him without a warrant upon his arrival at the storage facility. He further contends that the search of his Mercury Mariner SUV was improper. The government responds that the facts contained in the Warrant Affidavit and a "series of suspicious behavior" made Nasir's arrest proper, and that DSP reasonably believed that the Mariner would contain evidence of illegal activity. (D.I. 53 at 14)

Generally, when a defendant challenges a warrantless search and seizure, the burden is on the government to demonstrate by a preponderance of the evidence that the acts were constitutional. *See United States v. Williams*, 400 F. Supp. 2d 673, 677 (D. Del. 2005). Nasir cites the Third Circuit's opinion in *United States v. Massac*, 867 F.2d 174 (1989), for the proposition that a "canine alert can support probable cause to arrest [only] if other factors are present." (D.I. 51 at 14) Nasir argues that "there were no other factors" besides the dog sniff, and while the sniff test "might establish probable cause to search the locker," the "only proof" connecting Nasir to that locker was the storage facility owner's assertion, which was contradicted by the Rental Agreement. (*Id.*)

The Court disagrees. By the time DSP officers stopped Nasir in his Mercury SUV and detained him, another officer had observed him leave his home, place a large black object in the cargo area of his vehicle, and drive directly to the storage facility. (*See* Tr. at 26) DSP officers were aware of Nasir's criminal record, and stopped his vehicle only once he had turned his

---

[2]The Court need not reach the government's alternative argument based on the "good faith exception" to the exclusionary rule. (*See* D.I. 53 at 12)

9

vehicle into the lane containing until C69, at which the canine had already alerted to the likely presence of illegal drugs. Even with the discrepancy in unit numbers between the facility owner's statements and the Rental Agreement, probable cause existed at that point to arrest Nasir, as the officers had a reasonable belief Nasir had committed (and may again be in the process of committing) a drug-related crime. The totality of the circumstances known to DSP officers at that point was "sufficient to warrant a prudent man in believing that [Nasir] had committed or was committing an offense." *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984) (internal quotation marks omitted); *see also United States v. Meyers*, 308 F.3d 251, 255 (3d Cir. 2002) ("Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested.").[3]

Probable cause also existed to search Nasir's Mariner SUV. Under *Arizona v. Gant,* 556 U.S. 332 (2009), police may search a vehicle incident to arrest "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Id.* at 335. Here, by the time DSP officers searched the Mariner, they knew at least the following: Nasir had been observed arriving at the storage unit several times a day, accessing the unit for only a few

---

[3]Nasir points to inconsistencies in the record regarding whether he was arrested based on probable cause by the time he turned his vehicle down the lane toward unit C69, or instead if the basis for his detention was to prevent him from interfering with the investigation and search of the unit's contents. (*See* D.I. 54 at 1-2 (describing sequence of events as "murky"); *see also* Tr. at 53-54 (Skinner testifying Nasir was briefly detained to avoid interference with search, before being arrested, which did not occur until after marijuana was found in until C69)) Because the Court finds there was sufficient evidence to support probable cause, Nasir's arrest or detention was lawful in either event.

minutes, and then leaving; Nasir had been observed placing a large object in the cargo area of the Mariner and then driving directly from his home to the storage facility; Nasir had a felony conviction for a drug-related offense; a canine had alerted to the odor of narcotics in the storage until associated with Nasir; and Nasir had been observed driving the same Mariner earlier that day. (*See* Tr. at 8-9, 12-13, 21, 26-28; D.I. 30-2 at 6 of 10 ¶ 7) Based on all this evidence, it was reasonable for DSP officers to believe that evidence of illegal narcotics activity may be found in the Mariner. Nasir is simply incorrect when he contends that the "[t]he only fact the government points to [to] support its case is that [Nasir] placed a large, black object in the trunk of his car before driving to the storage facility." (D.I. 54 at 2-3; *see also generally United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002) ("Because the Task Force observed Burton leave what they thought to be a drug deal and place the results of that transaction in his trunk, probable cause existed to conclude that the Maxima itself was involved in an illegality, regardless of Burton's seizure."))[4]

---

[4] Again, Nasir points to arguable inconsistencies in the record, specifically whether the search of the Mariner occurred "incident to his arrest," or if it instead occurred prior to his arrest, when he was being held only for the purpose of preventing his interference with the search of unit C69. Nasir only raises this particular point in his reply brief. (*Compare* D.I. 51 at 14 (seeking to suppress items recovered from Mariner because Nasir's "arrest was unlawful") *with* D.I. 54 (focusing on *Gant*, vagueness of record as to timing of search of Mariner, and questioning whether search of Mariner was incident to arrest) Litigants "are not permitted to reserve material for a reply brief that could and should have been included in their opening brief." *Fed. Election Comm'n v. O'Donnell*, 2016 WL 5219452, at *8 (D. Del. Sept. 21, 2016) (citing D. Del. L. Civ. R. 7.1.3(c)(2)); *see also United States v. Heilman*, 377 F. App'x 157, 198 (3d Cir. 2010) ("A party's argument is waived if it is raised for the first time in a reply brief."). In any case, even assuming the Mariner was searched before DSP officers intended to place Nasir under arrest, the search of the vehicle appears to have been within the scope of the automobile exception. *See United States v. Ross*, 456 U.S. 798 (1982); *United States v. Andrew*, 417 F. App'x 158, 163 (3d Cir. 2011); *United States v. Lindsey*, 2009 WL 1616121, at *2 (D. Del. June 9, 2009) ("The Supreme Court's decision in *Gant* has no effect on the automobile exception, which allows police to search a vehicle where probable cause exists to believe that the vehicle contains

The Court is not persuaded that DSP's seizure of Nasir and search of the Mariner were "unreasonable" under the Fourth Amendment.

### D. Nasir's Post-Arrest Statements

Citing *Miranda v. Arizona*, 384 U.S. 436 (1966), Nasir argues for the suppression of any statements he made while in DSP's custody and before being advised of his rights. The government, citing *Harris v. New York*, 401 U.S. 222 (1971), responds that it "will not seek admission of these pre-*Miranda* statements in its case-in-chief," but will seek to use the statements should Nasir testify at trial "in an inconsistent manner." (D.I. 53 at 16) Nasir's motion, therefore, is moot. The Court will rule on use of the statements for impeachment purposes should the government seek permission to introduce the statements at trial.

### E. Probable Cause to Search Nasir's Home and Car

Nasir seeks to exclude evidence found during searches of his home and Dodge Charger. Nasir does not challenge the legal sufficiency of the warrant underlying these searches, but rather contends that the "information underlying the application for the search warrant . . . was fruit of the poisonous tree." (D.I. 51 at 15) Given that the Court has not found any violation of Nasir's Fourth Amendment rights, it follows that there is no reason to exclude the evidence found at these locations.

---

evidence of criminal activity, regardless of whether that criminal activity is related to the offense of arrest.") (citing *Ross*, 456 U.S. at 820-21). Moreover, it is Nasir's contention that he was under arrest at the time the Mercury was searched (*see* D.I. 51 at 12 ("When Mr. Nasir pulled into the parking lot of the storage facility, he was stopped by police, handcuffed, and placed in the back of a patrol vehicle. Mr. Nasir argues that ***these acts amount to an arrest*** and that the information the police had when he was arrested was not enough to support probable cause.") (emphasis added)), from which (if accepted) it follows that the applicable standard is supplied by the "search incident to arrest" standard.

## IV. CONCLUSION

For the reasons given, Defendant Malik Nasir's motion to suppress will be denied. An appropriate order follows.